**Opinion issued November 21, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00682-CV

———————————

## IN RE COMMITMENT OF WILLIAM KENNETH ROY

---

### On Appeal from the 239th District Court
### Brazoria County, Texas
### Trial Court Case No. 113967-CV

---

### MEMORANDUM OPINION

This is a civil commitment action under the Texas Civil Commitment of Sexually Violent Predators Act (the SVP Act). *See* TEX. HEALTH & SAFETY CODE §§ 841.001–.153. After the parties agreed to a bench trial, the trial court found, beyond a reasonable doubt, that appellant William Kenneth Roy is a sexually violent predator. The trial court signed a final judgment and commitment order committing

Roy to involuntary treatment and supervision upon his release from prison on parole. In two issues, Roy contends that the evidence is legally and factually insufficient to support the "behavioral abnormality" element of the State's case.

We affirm the trial court's judgment and order of civil commitment.

## Background

In January 2016, after a plea of guilty, the trial court convicted Roy of five counts of sexual assault of a child and imposed five concurrent ten-year sentences in the Texas Department of Criminal Justice.

In August 2021, after Roy had served over seven years of his sentence[1] and prior to his release on parole, the State petitioned to have him deemed a sexually violent predator (SVP) subject to civil commitment under the SVP Act. *See id.* § 841.081. The case proceeded to a bench trial and the trial court heard from two witnesses: Roy and the State's expert, Dr. Christine Reed.

### A. Roy

At the time of the commitment proceeding, Roy was twenty-eight years old and had served roughly nine-and-a-half years of his ten-year sentence. He testified that he "started acting out sexually" from an early age. Roy stated that in November 2005, at the age of twelve, Roy committed a sexual offense against his half-sister,

---

[1] At the time of his conviction, Roy received credit for almost three years of time served.

2

who was seven at the time. Roy testified that he forced his mouth to her vagina, stating that he was not sexually attracted to her but "curious." He acknowledged that he had been watching pornography around the time of the offense. Though he could not recall the exact age, Roy testified that he was "pretty young" when his cousin introduced him to pornography.

Roy testified that a few months after the assault of his half-sister, he had sexual contact with his half-brother, aged three. Roy stated that he had asked his half-sister if he could put his mouth on her vagina again, and when she refused, he turned to his half-brother. Roy denied any sexual attraction to his half-brother but admitted that he knew his conduct with his siblings was wrong and that he was sexually aroused during both offenses. After the assault of his half-brother, his half-brother and half-sister made outcries to his stepmother (their mother), who reported the incidents to law enforcement.

Eventually, the charges relating to Roy's half-sister were reduced to injury to a child, and the charges concerning his half-brother were dropped. The trial court determined that Roy engaged in delinquent conduct, namely, bodily injury to his half-sister, and placed him on probation for four years, subject to various conditions. Roy testified that even though he understood the probation requirements and the risk that he could be sent to Texas Youth Commission (TYC) if he violated those terms, he violated those conditions "several times." Roy testified that he "had two

3

violations for watching pornography," "one for tardies at school," and "one for fighting at school." When questioned at trial, Roy denied that he was suspended from school for touching a female student inappropriately. He testified that he became involved with a gang during his probation period and engaged in criminal activity as part of the gang. In total, Roy acknowledged nine probation violations but testified that he never failed a drug test or violated his curfew. Roy stated that his probation was extended for an additional eighteen months because of his probation violations.

Roy lived with several different family members, including his father, mother, grandmother, and grandfather, during his probation. Roy admitted getting into trouble for downloading pornography at his grandmother's house and testified that he was ordered to live at Pegasus Schools and attend sex offender treatment at that facility. Roy stated that he remained at Pegasus for approximately a year and a half, but "did not like being there" and "[had] problems" with participation in therapy and talking back to staff.

Roy testified that although he made disclosures concerning sexual fantasies about his half-sister and half-brother during his time at Pegasus, he fabricated these fantasies after failing a polygraph wherein he was asked to disclose all his sexual offenses and sexual fantasies. Roy testified that he was told if he did not pass the polygraph, he would be sent to TYC. He also testified that he made additional untrue reports while at Pegasus, including one concerning a sexual fantasy involving

4

putting a shock collar on his grandmother and sexually assaulting her, and another about "having sex with dead females." Roy admitted that, during his treatment at Pegasus, he also reported engaging in sexual activity with two of his cousins, one male and one female, from the ages of seven to twelve. He did not claim these reports were false. Roy testified that he was unsuccessfully discharged from Pegasus for "failing a polygraph" and that he was written up for stealing from a staff member.

After his initial discharge from Pegasus, Roy lived with his grandfather. Roy testified that he violated his probation by watching pornography at his grandfather's house. Following a motion to revoke, the Court extended Roy's probation until his eighteenth birthday and ordered him to return to Pegasus. At trial, Roy denied that he reported the sexual fantasies concerning his grandmother, half-sister, and half-brother a second time when he returned to Pegasus. He testified that he was released six to nine months later but was still on probation at that time.

Roy stated that his probation was then revoked for "tardies" at school. He also acknowledged that another condition of his probation prevented him from being around other children without adult supervision and that he violated this condition with his girlfriend, though he disputed her age.[2] In January 2011, the court revoked Roy's probation and committed him to TYC until he turned nineteen.

---

[2] Roy testified that the condition prevented him from being alone with someone under eighteen but that he believed his girlfriend was eighteen. However, the order

5

Roy testified that he was in TYC for approximately one year. During that time, he participated in voluntary sex offender treatment, not because he had a problem with "sexual issues," but because he "just felt like there was more that [he] could learn." Though Roy got into a fight and had some "referrals" for disrespecting staff at TYC, he did not engage in any sexual misconduct during his time there and was released early on parole. Later, in July 2012, Roy was discharged from parole after completing his sentence. He testified that at that point, he knew what he did to his siblings in 2005 was wrong but he denied any ongoing problem.

In total, Roy spent approximately six years in sex offender treatment. He testified that the treatment was helpful because it gave him "a more in-depth way of seeing things," taught him about everyday life, and how to be a positive person.

Roy testified that after his release from TYC, he lived with his girlfriend. His girlfriend regularly babysat a four-year-old girl at the couple's home. Though Roy denied ever being alone with the girl, or any sexual attraction to her, he pleaded guilty to five counts of sexual assault against her and received a sentence of ten years' confinement. Specifically, on January 15, 2016, the trial court convicted Roy of the following: (1) intentionally and knowingly causing the penetration of the

revoking Roy's probation was admitted as an exhibit during the commitment proceedings and stated that as a condition of his probation, Roy was to refrain from contact with a minor under the age of fifteen. The order found that Roy violated this condition.

child's vagina with Roy's finger; (2) intentionally and knowingly causing the penetration of the child's vagina with his penis; (3) intentionally and knowingly causing the penetration of the child's anus with an unknown object; (4) intentionally and knowingly causing the penetration of the child's vagina with a pen; and (5) intentionally and knowingly causing the child's vagina to contact Roy's mouth. During the hearing, Roy denied having committed any of these offenses.[3]

At the time of the commitment hearing, Roy remained incarcerated for the offenses against the four-year-old. He testified that he had been written up for rule violations and received "disciplinaries" for refusing to work, refusing orders, tattoos, and tattoo paraphernalia, though none for sexual misconduct. Roy admitted that several of his new tattoos were gang related but denied any ongoing involvement with a gang, explaining that the tattoos were his way to remember his time in the gang. He testified that he received a disciplinary in December 2019 for threatening an officer. He noted that he did not receive any citations relating to drugs or alcohol while in prison.

Regarding any further sex offender treatment, Roy testified that "if somebody that has a higher education than [him] that studies this feels like [he needs it], then [he] need[s] it." However, Roy denied having any "sexual issues" that he needed to

---

[3]     Dr. Reed testified that during their interview, Roy told her that he pleaded guilty
        because he was facing life in prison and his mother asked him to accept the plea.

work on in sex offender treatment. Roy testified that in his treatment, he learned about triggers that could lead to sexual offending. Roy stated that his triggers included unstable environments. He testified that he was not at risk for reoffending, but he needed to stay away from children to avoid being falsely accused. Roy stated that he would be willing to continue sex offender treatment following his release but also testified that he did not need it. He testified that if he could, he would tell his half-brother and half-sister: "I apologize." Roy ultimately admitted that what happened was "totally [his] fault." He claimed he would not reoffend because "it's not in [him]" and "that's not who [he is]."

Roy testified that while in prison, he completed a six-month culinary arts program and would like to pursue employment in that area upon release. He also participated in a class called "CHANGES," which he described as helping to identify risk factors, learning new ways of thinking, and identifying "what led you down the wrong path and how to prevent it from happening again." Roy stated that following his release, he planned to reside with his mother.

## B.     Dr. Christine Reed

Dr. Reed, a clinical and forensic psychologist, evaluated Roy and testified that in her opinion, Roy suffers from a behavioral abnormality.

Dr. Reed has a bachelor's degree in psychology and a doctorate in clinical psychology. She completed a postdoctoral fellowship in forensic psychology. Since

that time, she has been in private practice, conducting forensic assessments. These include determinations as to whether a person is competent to stand trial, insanity evaluations, risk assessments for general criminal recidivism, and sex offender risk assessments. She has been conducting behavioral abnormality evaluations since 2011.[4] She is licensed in Texas and California.

In conducting a behavioral abnormality evaluation, Dr. Reed's methodology includes a review of the relevant records (documentation of past offenses, juvenile history, mental health and treatment records, and jail or prison records) and a clinical interview, either in person or via teleconference, followed by completion of a sexual history questionnaire and other testing. Dr. Reed then compiles this information to form her opinion as to whether an individual has a behavioral abnormality. In this case, Dr. Reed reviewed over 3,000 pages of records and conducted a three-and-a-half-hour interview. She also reviewed the report of Dr. Turner, another psychologist who evaluated Roy prior to her involvement, and determined that Roy suffered from a behavioral abnormality.

---

[4]     The trial court's findings of fact state that Dr. Reed "has been conducting behavioral abnormality evaluations since 2012": however, Dr. Reed testified that she has been conducting these evaluations "since around 2011."

1.     **Risk Factors**

According to Dr. Reed, the two main risk factors for sexual recidivism, or reoffending sexually, are sexual deviance and an antisocial orientation. Dr. Reed identified both risk factors in Roy.

Sexual deviance means sexual behaviors, including urges and fantasies, that deviate from what is considered normal. She testified that the most extreme example is pedophilia, which society considers deviant and abnormal. It is significant here that Roy has been convicted of sexually violent offenses against a child.

Dr. Reed diagnosed Roy with antisocial personality disorder. She explained that this is a long-standing pattern of violation of the rights of others or engaging in acts that are potentially illegal or criminal. This may also be shown by aggressiveness, a lack of remorse, deceitfulness, and impulsivity. In Roy's case, the records reflect a history, beginning at an early age, of sexual offenses, theft, supervision problems, and difficulty following the rules. She also identified his involvement in a gang, probation violations, and other violations while at TYC as supporting a diagnosis of antisocial personality disorder.

2.     **Sexual Offending History**

According to the records, Roy began committing sexual offenses as a juvenile. In 2005, at the age of twelve, Roy assaulted his seven-year-old half-sister. His half-

sister reported that even though she told him "no," Roy placed his mouth on her vagina, touched her breasts, and kissed her neck while their parents were asleep.

Roy's half-brother reported that Roy put his penis in his half-brother's mouth and penetrated his half-brother's anus with his penis on more than one occasion. Roy's half-brother was three at the time. Reports indicate Roy also performed oral sex on his half-brother on one occasion and had his half-brother perform oral sex on him twice. Roy admitted to some, but not all, of these sexual assaults against his half-sister and half-brother. Dr. Reed testified that she found it significant that Roy minimized or denied the acts during her interview, because he previously admitted to some of the acts in the records she reviewed. Dr. Reed classified these offenses as sexually deviant because Roy committed them against his siblings and because of the relatively young ages of Roy and his siblings. Dr. Reed testified that even though the charges related to Roy's half-brother were dropped, and the charges pertaining to his half-sister were reduced, she still considered all the available information in forming her opinions because what is important is what actually occurred, not the ultimate charge or disposition.

### 3. Protective Factors

Dr. Reed testified that protective factors are considerations that reduce the risk of reoffending. In Roy's case, she pointed to his participation in sex offender treatment (although she noted he was discharged unsuccessfully three times prior to

11

completion). Dr. Reed also identified his lack of substance abuse problems and his support system within the community, particularly his mother, as protective factors. However, she explained that these protective factors did not outweigh his risk factors, particularly in the case of his sex offender treatment, because he reoffended after completing treatment.

### 4. Diagnoses

Based on her assessment, Dr. Reed diagnosed Roy with pedophilic disorder and antisocial personality disorder. She testified that pedophilic disorder means that the individual commits acts or has urges and fantasies involving prepubescent children. Here, Roy was convicted on five counts of sexual assault of a four-year-old girl when he was nineteen. Dr. Reed testified that pedophilic disorder is a congenital or acquired condition that can affect a person's emotional or volitional capacity and is chronic in nature. She explained that even though Roy had not committed a sexual offense against a child in the ten years following his conviction, this did not mean he was cured of his pedophilia because he has not been in treatment in prison and did not have access to potential underage victims in prison.

As to the antisocial personality disorder, Dr. Reed testified that it includes a long-standing pattern of violations of the rights of others and engaging in acts that are potentially illegal or criminal. Regarding Roy, Dr. Reed noted his early history of sexual offenses, theft, problems with supervision, gang involvement, and

probation violations. She described antisocial personality disorder as a congenital or acquired condition that affects someone's emotional or volitional capacity. To meet the criteria, one has to have a longstanding pattern of behavior, so the condition tends to be chronic, although it can diminish with age.

Dr. Reed also concluded that Roy had a "rule out" for paraphilic disorder. She explained that a "rule out" meant that she did not have enough information for a specific diagnosis of the disorder, but it was a consideration based on the information available. Dr. Reed testified that a paraphilic disorder is a "catchall" diagnosis given when there is not enough information to make a more specific diagnosis, but indications of another diagnosis are present. For example, in Roy's case, Dr. Reed noted instances of bestiality and references to fantasies about sexual acts with dead people, as well as violent elements of raping and wanting to inflict harm, that appeared sadistic in nature. However, she did not have sufficient information to support a diagnosis of zoophilia or necrophilia.

## 5. Test Results

Dr. Reed evaluated Roy using the Psychopathy Checklist-Revised (PCL-R), which she explained is a measure of psychopathy or psychopathic traits. The maximum score on the PCL-R is 40, and a score of 30 and above is considered a psychopath. Dr. Reed gave Roy a score of 27, which she testified is considered "high" in traits of psychopathy.

Dr. Reed also scored Roy on the Static-99R, which is a measure of the risk of reoffending. One of the factors considered by the Static-99R is the individual's age. Dr. Reed testified that Mr. Roy's age of twenty-eight (twenty-nine at the time of release) places him in the highest risk category, because research suggests that as a person ages, their risk of reoffending declines. Dr. Reed testified that she initially scored Roy as a 4 out of possible 13, but after learning additional information about his victims, she would give him a 5. Dr. Reed explained that either a 4 or a 5 would put Roy in the above-average risk category for reoffending. A score of 6 is needed to place an individual in the highest risk category.

Dr. Reed also evaluated Roy using the Risk of Sexual Violence Protocol (RSVP), which she described as a "list of other risk factors for reoffending." Dr. Reed outlined the risk factors she identified in Roy from this checklist, including: (1) chronicity of sexual violence; (2) escalation of sexual violence; (3) physical coercion in sexual violence; (4) psychology coercion in sexual violence; (5) extreme minimization and denial of sexual offenses; (6) problems with self-awareness; (7) sexual deviance; (8) major mental illness[5]; (9) problems with intimate relationships; (10) problems with employment; (11) problems with planning; (12) problems with treatment; and (13) problems with supervision.

---

[5]  Dr. Reed testified that, based on the records she reviewed, Roy had a "long history" of major depressive disorder, bipolar disorder, and anxiety disorder. She stated that Roy was being treated with an antidepressant for depression and anxiety.

### 6.    Sex Offender Treatment

Dr. Reed testified that Roy's most recent parole case summary indicated he had a "high" need for sex offender treatment. In her opinion, Roy does not have a good understanding of what he learned from his prior sex offender treatment. While Roy could use some of the phrases he learned in treatment, he struggled to explain what those phrases mean. Further, Roy testified to having difficulty in treatment and being unsuccessfully discharged.

Dr. Reed explained that although Roy acknowledged his high-risk situations are those where he felt he lacked control or felt trapped, he could not explain or understand how this played a role in his prior offenses. For example, when she asked Roy about the offense with his younger half-sister, he said he committed the offense because he was "just curious." This concerned Reed because, despite his years of treatment, he still did not appreciate what caused his behavior or how to prevent it from happening. She further testified that Roy could not explain his "relapse prevention plan," which she noted was a "[p]retty standard term from sex offender treatment." Regarding the "CHANGES" program, Dr. Reed testified that this was not sex offender treatment. Dr. Reed opined that Roy did not have the tools or insight necessary to manage and control his sexual deviance or prevent future offenses.

### 7. Behavioral Abnormality

Dr. Reed opined that Roy suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. She testified that this abnormality derives from his antisocial orientation, his psychopathic traits that allow him to violate the rights of others, his displayed lack of empathy or remorse, and his demonstrated sexual deviance or sexually deviant thoughts.

## Sufficiency of the Evidence

In his first and second issues, Roy contends that the evidence is legally and factually insufficient to support the "behavior abnormality" element of the State's case.

## A.     Standard of Review and Applicable Law

A commitment proceeding under the SVP Act is a civil proceeding that incorporates the "beyond a reasonable doubt" standard of proof typically reserved for criminal cases. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020) (explaining that SVP proceeding is "rare civil case in which the burden of proof is beyond a reasonable doubt"). Thus, in reviewing verdicts in SVP cases for legal sufficiency of the evidence, we use the appellate standard of review applied in criminal cases. *Id.*; *see also In re Commitment of Summers*, No. 01-19-00738-CV, 2021 WL 3776751, at *11 (Tex. App.—Houston [1st Dist.] Aug. 26, 2021, no pet.) (mem. op.).

Applying the legal sufficiency standard in criminal cases in the context of an SVP commitment proceeding, we assess the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find, beyond a reasonable doubt, the elements required for commitment under the SVP Act. *See In re Commitment of Stoddard*, 619 S.W.3d at 675; *see also In re Commitment of Summers*, 2021 WL 3776751, at *11. "It is the fact finder's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts." *In re Commitment of Summers*, 2021 WL 3776751, at *11 (quoting *In re Commitment of Stuteville*, 463 S.W.3d at 551); *In re Commitment of Mullens*, 92 S.W.3d 881, 887 (Tex. App.—Beaumont 2002, pet. denied) (stating fact finder may resolve conflicts and contradictions in evidence "by believing all, part, or none of the witnesses' testimony").

In evaluating a factual sufficiency challenge to the evidence, we must "determine whether, on the entire record, a reasonable factfinder could find beyond a reasonable doubt that the defendant is [a sexually violent predator]." *In re Commitment of Stoddard*, 619 S.W.3d at 668. The assumption that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so remains. *Id.* at 674. However, rather than "disregard" disputed evidence that a reasonable factfinder could not have credited in favor of the finding, the court must determine whether, in light of the entire record, that evidence "is so significant that

17

a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true. *Id.* In an SVP case where the burden of proof is beyond a reasonable doubt, the evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the SVP finding, along with the undisputed facts that do not support the finding, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met. *Id.* at 675.

In an SVP civil commitment case, the State must prove beyond a reasonable doubt that a person is a sexually violent predator. *See* TEX. HEALTH & SAFETY CODE § 841.062(a). A person is a "sexually violent predator" if he is a repeat sexually violent offender and suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.[6] *Id*. § 841.003(a). A "behavioral abnormality" is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id*. § 841.002(2).

---

[6] On appeal, Roy challenges only the sufficiency of the evidence to support the "behavioral abnormality" element of the SVP determination; he does not contest that he is a "repeat sexually violent offender."

**B.    Legal Sufficiency**

Roy argues that the evidence is legally insufficient to support the "behavioral abnormality" element of the State's case because the evidence presented at trial "cannot support a finding that [Roy's] risk to sexually reoffend is anything more than 'above average' or 'probable, beyond a mere possibility." Roy's argument focuses on the phrase "likely to engage in a predatory act of sexual violence" as found in the SVP Act's definition of "sexually violent predator." *See id.* § 841.003(a).

Roy claims that case law does little to explain this language or the "behavioral abnormality" requirement as a whole; therefore, we should consider the SVP Act's legislative history, particularly, the Legislature's findings that Chapter 841 was meant to apply to "high risk" sex offenders.[7] Roy further contends that because the Legislature intended the SVP Act to apply to "high risk" offenders, and because Roy's risk to sexually reoffend is only "above average" or "probable, beyond a mere possibility," the evidence is legally insufficient to support the trial court's judgment.

We decline any invitation by Roy to impose a more stringent burden of proof than that required by the SVP Act. In rejecting a similar argument, the El Paso Court

---

[7]    *See* TEX. HEALTH & SAFETY CODE § 841.001 ("The legislature finds that a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence.").

of Appeals noted that "[c]ourts have uniformly rejected attempts by appellants to incorporate additional sub-requirements into the elements of the SVP Act." *In re Commitment of Brown*, 656 S.W.3d 418, 430 (Tex. App.—El Paso 2022, no pet.) (citing *In re Commitment of Stoddard*, 619 S.W.3d at 677; *In re Commitment of Williams*, 539 S.W.3d 429, 438–39 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *In re Commitment of Hall*, No. 09-09-00387-CV, 2010 WL 3910365, at *2–3 (Tex. App.—Beaumont Oct. 7, 2010, no pet.) (mem. op.)). Similarly, in reversing the decision of the court of appeals, the *Stoddard* court denounced the lower court's focus on the "small but extremely dangerous group" language contained withing the SVP Act's legislative findings, because this language "is not part of the statute's definition of 'sexually violent predator' and was not an element the jury was required to find." 619 S.W.3d at 677.

As this Court recently observed, *Stoddard* "clarified that the two statutory elements—repeat sexually violent predator and behavioral abnormality—are the only factors courts should consider in a sufficiency review." *In re Commitment of Atchison*, No. 01-22-00424-CV, 2023 WL 4003066, at *7 (Tex. App.—Houston [1st Dist.] June 15, 2023, no pet.) (mem. op.); *see also In re Commitment of Summers*, 2021 WL 3776751, at *14 (summarily dismissing request to consider whether appellant was part of "small but extremely dangerous group" mentioned in legislative findings in light of holding in *Stoddard*); *In re Commitment of Tryon*, 654

S.W.3d 29, 38 (Tex. App.—Eastland 2022, pet. denied) (noting "*Stoddard* has clearly foreclosed" argument that "behavioral abnormality" element must be construed as incorporating SVP Act's legislative findings and legislative history); *In re Commitment of Ausbie*, No. 14-18-00167-CV, 2021 WL 1972407, at *11 (Tex. App.—Houston [14th Dist.] May 18, 2021, pet. denied) (mem. op.) (declining to examine legislative history to construe intended meaning of "behavioral abnormality" in light of *Stoddard*). Considering the foregoing authorities, we reject Roy's argument that we must look beyond the plain language of the statute to determine whether the evidence is legally sufficient to support a finding that he meets the legislatively intended definition of "behavioral abnormality."

We next consider Roy's arguments that generally, the State did not present legally sufficient evidence to support the "behavioral abnormality" element of its case. To summarize, the trial court heard testimony from Roy, in which he admitted that he sexually assaulted his seven-year-old half-sister and three-year-old half-brother. Roy also testified that he engaged in sexual contact with two different cousins over a period of five years, beginning when he was seven. Further, the trial court heard about Roy's plea of guilty to and conviction for five counts of sexual assault of a four-year-old girl, for which he was serving five, concurrent ten-year sentences. Though Roy denied sexually assaulting the four-year-old, as the sole judge of the weight and credibility of the evidence, the trial court was free to

21

disregard this testimony. *See In re Commitment of Mullens*, 92 S.W.3d at 887. The trial court was also free to disregard Roy's self-serving testimony that he was not at risk of reoffending. *See id.*

The trial court also had before it the testimony of Dr. Reed, the State's expert, who testified that Roy suffered from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Roy did not present a competing expert. Dr. Reed explained her methodology, which followed what courts have found to be the standard, accepted practice within her field. *See, e.g.*, *In re Commitment of Bohannon*, 388 S.W.3d 296, 305 (Tex. 2012) (noting that approach of all three experts in SVP case was "consistent with the little guidance provided by the [SVP] Act," where experts "[a]ll agreed that in assessing whether a person has the behavioral abnormality for an SVP, all available information should be considered, and that the person should be interviewed"; experts also "suggest[ed] that a medical diagnosis should be made and actuarial risk test should be applied"); *In re Commitment of Brown*, 656 S.W.3d at 431 (holding evidence legally sufficient in SVP case and outlining forensic psychologist's "holistic evaluation," which included consideration of protective and risk factors, Static-99 and PCL-R, "a practice both well-accepted in the forensic psychology community and founded on extensive factual support"); *In re Commitment of Cordova*, 618 S.W.3d 904, 917 (Tex. App.—El Paso 2021, no pet.) (and cases cited therein).

Dr. Reed outlined the various assessments she performed, the records she reviewed, and the results of her hours-long interview with Roy. From Dr. Reed, the trial court heard that Roy suffers from pedophilic disorder and antisocial personality disorder and possesses psychopathic traits. Dr. Reed testified that Roy's disorders affect his emotional and volitional capacity and are chronic in nature. Again, Roy did not present any evidence, other than his own testimony, to refute Dr. Reed's determinations.

Viewing the evidence in the light most favorable to the verdict, we conclude that the trial court, as the factfinder, could have found beyond a reasonable doubt that Roy is a sexually violent predator under the SVP Act. *See Stoddard*, 619 S.W.3d at 675. We overrule Roy's first issue.

## C.    Factual Sufficiency

In his second issue, Roy challenges the factual sufficiency of the evidence to support the "behavioral abnormality" element of the State's case. Roy argues that the evidence is factually insufficient because "it is undisputed that Mr. Roy['s] risk to sexually reoffend cannot be anything more than 'above average' or 'beyond a mere possibility'"; Roy scored less than a "30" on the PCL-R; and "the State agreed to dispose of the five-count indictment in Mr. Roy's 2013 case with a generous plea bargain."

First, we disagree with Roy's characterization that his risk of reoffending is no more than "above average." While Dr. Reed scored Roy in the "above average" category of the Static 99-R, this was only one component of her analysis. Dr. Reed testified that there are other risk factors that are important to consider outside of the Static 99-R. *See Barrientes v. State*, No. 14-22-00023-CV, 2023 WL 1169022, at *4 (Tex. App.—Houston [14th Dist.] Jan. 31, 2023, no pet.) (mem. op.) (rejecting factual sufficiency argument regarding appellant's placement in "average risk" category of Static-99; court noted Dr. Reed's testimony in that case that Static-99 was "just one piece of the puzzle" that does not capture all aspects of likelihood to reoffend); *see also In re Commitment of Williams*, 539 S.W.3d at 440 (determining even "low-moderate" Static-99R score did not render evidence factually insufficient if other evidence in record supported finding of behavioral abnormality). In Roy's case, Dr. Reed also observed thirteen other risk factors, as detailed above, using the RSVP checklist.

Similarly, the fact that Roy scored less than "30" on the PCL-R does not render the evidence factually insufficient. Dr. Reed's evaluation of Roy used a holistic approach, considering not only his test results but also his criminal history and past behavior, including conduct that did not result in criminal charges, his treatment records, and his own statements during their interview. It is the province of the factfinder to weigh the evidence against conflicting evidence, such as Roy's

24

own testimony. *See Barrientes*, 2023 WL 1169022, at \*4. The court was free to accept or reject Dr. Reed's opinions. *See Atchison*, 2023 WL 4003066, at \*8 (citing *Stoddard*, 691 S.W.3d at 668).

Considering the entire record, we determine that any disputed evidence that a reasonable factfinder could not have credited in favor of the SVP determination, along with the undisputed facts that do not support the finding, is not so significant that the trial court could not have found beyond a reasonable doubt that the statutory elements were met. *See Stoddard*, 691 S.W.3d at 668. We overrule Roy's second issue.

## Conclusion

We affirm the trial court's judgment and order of civil commitment.

Amparo Monique Guerra
Justice

Panel consists of Justices Goodman, Rivas-Molloy, and Guerra.

25